Robert Landry on behalf of the Safety Council of Southwest LA. It's a small non-profit company overseen by a voluntary unpaid executive board. Hopefully my brief addresses all the issues and most, if not all, of your questions, so I would always default to the brief over any of my comments today. But as we mentioned, we feel this case presents a very novel situation where the Safety Council was absolved of liability in the Gender Pay Act case, but then found to have retaliated by keeping the plaintiff in her job from the start of the lawsuit through the end of trial, and afterwards even, and offering her a new contract at a higher rate of pay with objectively more favorable terms. And so we think, again, it was a jury trial, there were post-trial motions filed, and everything arises under the proper appeals standard, which, and we've cited in our brief, is there a legally sufficient evidentiary basis for a reasonable jury to have reached the decision that they did. And that standard is especially deferential with all reasonable inferences resolved in favor of the non-moving party. So I'm arguing against it, at least as far as a result of retaliation, but then I also believe that standard very well supports the finding in the cross-appeal, the finding in favor of no pay disparity based upon gender. So here we absolutely believe it's undisputed that there's no reasonable evidentiary basis for the retaliation filing. The plaintiff here complained of essentially six actions, all of which we believe had no basis. We list them, they're cited at page 24 to 25 of our brief, but we believe those actions, the complaints that she was making, were not adverse employment actions. But the district court apparently, in the post-trial motion, agreed that five of the six didn't rise to that level, and the only one that the district court focused on of what was articulated and argued at trial was the reduction of a discretionary bonus. That particular year the plaintiff received a $6,000 bonus, not the $10,000 bonus she received before, but she also received a pay raise of $5,700. That more than offset the bonus reduction. But the court focused on that as a justification for the jury's retaliation filing. It was only a $4,000 reduction, and the retaliation filing was $120,000. But in our view, it's absolutely undisputed. If you read the language of the bonus provision, it says the executive may receive annual performance bonuses directly tied to strategic efforts, membership, and financial results as approved by the executive. And so, simply put, may doesn't mean shall or will, and we think the best evidence of that was early on when the case was commenced, and the plaintiff herself wrote, seeking some changes in her contract, suggesting that the bonus language be changed from may to will receive a bonus. We think there's no better evidence that the plaintiff understood herself that this was a discretionary bonus. And we've cited, I believe, two or three cases, and I think they're district court, I don't know that there's an appellate court decision on this, where courts have said that to have an adverse employment action, it has to go to an ultimate employment decision. Hiring, firing, compensation, demotion, but that the denial of a discretionary perk, which is within the discretion of the employer to do, does not rise to the level of an adverse employment action. And we think that law is sound, and I guess the explanation for it is just because someone files an equal pay act claim, once that happens, in the real world, everything the employer does after that point is going to be portrayed, more often than not, as some sort of retaliation. If the plaintiff doesn't like it, they're going to say, hey, this was a foul play. Here we have a situation where there was a claim made, and the board bent over backwards to keep the plaintiff in her position. She stayed there. The claim was found not to have merit. But just because someone asserts a claim, does that mean that they deserted the claim, and going forward, hey, if there's any discretionary bonus, we have to give them the maximum every time, or else we're going to get knocked for it being a retaliatory action. So of the six items that were listed, the trial court only found that the $4,000 bonus reduction was arguably a retaliatory action. And we don't believe, because of the discretionary language and because the case law recited, we just don't believe that should rise to a level of an adverse employment action. It should be discretionary. But even then, the $4,000 reduction didn't get anywhere near the $120,000 jury award. And that's where the court came in and said that, well, the non-renewal of the plaintiff's contract was an adverse employment action. And that's what we believe, undisputedly, there's no factual basis for. The plaintiff had a three-year contract that automatically renewed unless either side said, hey, we're giving you notice that we're not going to renew it. And what the defendant did was they— Unless you take affirmative actions, the contract continues. I'm sorry? Unless you take an affirmative act to terminate, then the contract continues. Right. Unless you say we're not going to automatically renew, it would automatically renew. But again, just because someone brings an equal payout claim doesn't mean we're locked into being an employee forever. And what happened there, first of all, the plaintiff throughout this trial was always the chief operating officer from the start of her case to after the jury's verdict. That was her position. The second question she was asked at trial was, what is your current position? This was after the contract didn't renew. And she said, truthfully and honestly, my current position is chief operating officer of the safety council because she was. So as a matter of fact, I don't think there's any basis for—there was never an issue with her employment. But secondly, here she was offered a new contract, undisputedly, at a higher pay rate. It had a few more reporting requirements because that was one of the board's issues, but it was for a one-year term rather than three. But importantly, in the three-year contract, there was a provision that it could be terminated without cause by either party. And I think the notice requirement was about six months. So even though the original contract was a three-year contract, it only guaranteed employment for approximately six months because it could be terminated without cause. The new contract, the safety council completely eliminated its own ability to terminate her without cause. It retained it in the contract for her to do it, but they eliminated theirs. So they were offering her a new contract at a higher rate of pay that was guaranteed to be for a year unless there was a for-cause issue. So it was objectively, by any standard, a better contract. It was for a higher rate of pay, but more importantly, she never even—she had that job the whole time and never lost the job. And so that's why we believe, based upon the undisputed record, there's simply no evidentiary basis. You offered her a new contract if she could not be terminated without cause. Did you define cause? There was a—yes. The short answer is yes because termination for cause was defined.  Oh, there were a host—I don't know off the top of my head. It's in the record. There were a host of things such as, I'm sure, dishonesty or things of that nature. But significantly, again, that was in the earlier contract. The second contract said we cannot terminate without cause, and I'll put it this way. The cause reasons in the second contract were the exact same ones that were in the first. So the reasons for cause for termination— You didn't give her any greater assurance than she already had. I'm sorry? You didn't give her any greater assurance of that new contract than it had been in previous contracts then. Is that what you're saying? Greater insurance. You said you offered her a new contract without cause, and it couldn't fire without cause, but cause is defined. And you say it was defined just as it had always been defined. Right. So what I'm saying is in that aspect, the first contract and the second contract were the same. They were the same. The only differences were in the new contract, it was for a higher rate of pay, and it guaranteed her employment for at least a year. So in that aspect, it was better. So sitting side by side, the second contract was objectively, undisputedly more favorable to her, and we can't force her to take that contract. But again, it's undisputed, and we think the Miller v. University of Minnesota case is right on point. That's the case where I think it was a coach who coached hockey and softball claimed that her job was affected, but she was offered a new contract only for softball at the comparable rate of pay. And in that case, the court said they offered her a new contract at a comparable pay, but she turned it down. She couldn't even establish she was terminated from her position. And again, I think it's undisputed that the plaintiff here was never terminated, and more importantly, she had her job from the start, from the inception of this lawsuit, through the jury determination and when it came back. Her position was never impacted or changed whatsoever. Her position never changed, and in the context of that, where her position never changes, what is the factual basis for saying that there was an adverse employment action? There was no employment action. And as we argue, the only potential for an adverse circumstance was that she was offered a new contract at a higher rate of pay. And then the judge also made a comment about an alternative equitable remedy of front pay, and again, in this case, we didn't see that there was any basis for that whatsoever because there was no—there wasn't even an allegation of any sort of discharge, whether actual or constructive. That goes to both issues. I mean, if you have a case where there's no allegation of discharge, actual or constructive, there's no basis for a front pay award. And so—and we think the law is well settled on that. So when retaliation is gone, the basis for liquidated damages is gone, and the basis for return fees is gone. And then with respect to the jury's finding that correctly that gender was not a factor, again, we think applying that same appeal standard, the evidence is overwhelming that that's accurate. It's undisputed that the—her predecessor had a bachelor's degree and a degree in safety engineering. He had 25 years managing the health, safety, and environmental department of one of the largest petrochemical facilities over in Kalachu Parish. He was the one who came up and founded the training program there. The plaintiff had a sociology degree, and she had been managing people for about three or four years. And also, critically, Steve Morris, who was on the executive board, we discussed in there how there were problems with the prior guy who started paying himself more than he should and taking advantage of the situation. One of the main goals of the board in bringing someone new in was to correct that situation, remove the automatic bonus, automatic raise structures, bring that back under control. And that's a very legitimate basis. And those were all legitimate basis for the jury to properly conclude, as they did, that gender was not a factor. It was upheld by the district court in the Rule 50B motion. She found both of those were the case. And that's just not a basis. It's not—and we explained in detail. I'm going to reserve my time for my rebuttal. But I think we handle the opposition to the plaintiff's argument in detail in our briefs. They're trying to essentially argue that unless we almost show some sort of mathematical formula of how we do the computations to compare years of service, that somehow we can't win. And that's just not the law. They don't cite a case to support it. And we believe there's ample evidence supporting the jury verdict. In favor of safety counsel, we believe the undisputed record demonstrates that the basis for retaliation does not exist. And I think the only thing that I believe is really arguable there is someone could say, I guess you could say, well, that it's a discretionary bonus. Maybe there could be a basis for saying in their discretion that was retaliatory. But even—I don't think we have that here. But if it's a $4,000 issue, then there's no basis for the liquidated damages in terms of the award because that's not wages and that was just bonus. So I'm out of time. I'll be back on the bench. Thank you. Thank you, sir. You'll have some time on your own. Mr. O'Dowd. May it please the court, Tim O'Dowd on behalf of Joan Faulkner. I want to start by making it abundantly clear. Cases where the appellate and the appellee makes you realize just how careful you have to be when you take an appeal. When you're an appellate, it's based on a factual basis. You have to recognize it to the extent the jury has facts before them, not just what Ms. Faulkner may have testified, but she thought her problems were. Any facts that were presented before the jury are a basis for the jury to come to the conclusions they came to. So I want to make sure it's abundantly clear in this case how I am arguing this. On our appeal, the appeal of the wrongful EPA claim, we're stating that there are no facts. Zero. Zero facts, particularly about application of the statute.  Then in our appellee role, there are clearly tons of facts upon which the jury could have attached and said, you know what? Based on these facts, we think she's entitled to these things. And I'll try to get through it all. Obviously, I don't think I'll be able to get through all of it. I want to start off, judges, and I'm obviously not going to repeat my brief. And I said in my reasons for argument there are some nuances, and I'm trying to explain the nuances. This statute, I'll be blunt. I don't find the case law to be very – certainly the case law does not examine the statute as I have tried to examine the statute. I'll say it that way. And particularly, how do you deal with the three elements of affirmative defense versus the four, quote-unquote, catch-all affirmative defense? And what I've been trying to do in the judge – and I cite this in my brief – the judge says, do you really need to be precise? Do you need to be specific? Or can you have these generalized ideas? And I think she's wrong. She comes to the conclusion it could be this generalized. And also that's one of my problems with the jury instruction because the jury instruction leads to this ability for the jury to sit there and think if they have a reason, a cause, any cause, then it fits within the catch-all. Of course, if we say that, if any cause fits within the catch-all, then Articles 1, 2, and 3 have no meaning. So we can't say it that way. Two, proper interpretation of statute says that the fourth, the fourth element, catch-all, has to be like its friends, number 1, 2, and 3. And on page 60 of my brief, I cite a Fifth Circuit case where they make a fabulous distinction on the two ways that if you start off with specific things like 1, 2, and 3, then you have to assume the fourth is like these things. Whereas on the other hand, if you start with a generality and then start giving examples, then it's exemplary and you have a broader base. Page 60 of the Panetta case, I cited on that case, Fifth Circuit. Here, let's go into this question. So using the friends, here is the problem I have with this case, and I beg for a citation to a factual assertion by any person who made the salary determination. One statement, I will take that. I need to see it, and I have been looking for it. One statement that they applied it. So, committee is presented with an employee, and their basis for pay is the seniority system. I should say their basis for affirmative defense is the seniority system, which is the first element of affirmative defense. So the person who sets the salary said, I know we have the case. Remember, in this case, the trial judge said, same work, same pay. We're past that. It's now the defendant's affirmative defense. And the employer says, we have a seniority system. They rest their case and they sit. They lose. They should lose. It's not that you have a seniority system. It's that you applied the seniority system. They have to go to the next element. You can't just say, I have a seniority system. If you recall, some of the testimony in this case was, well, I kind of had the facts. Apparently, there were some meetings, I want to say in June and July of the summer, and this salary was set in September, I believe. And they had some meetings, and they discussed how much this man may have stolen and what he had done. And so they said, well, I had some of that in my mind. Did you apply? Did you apply? That's my question to this court. I gave and I referred to it. I put a softball, a stupid thing for a trial lawyer to do. I put a softball on the stand on a tee for Mr. Andropov. And I asked him, tell me how you differentiate it. Pursue it to the differential. Pursue it to the differential. How did you do it? And he went all over the place. But he sure as heck didn't say, we took this and we took that. Let me take that one step further. Their basis, and the judge pointed this out as a basis, that one of their basis was they needed to change things because of the theft that had been made. That's fine. That is a cause to take a step in action. But let's assume the next step. Let's assume this case again. Let's assume that Mr. McCorkadale and his predecessor, Jody Faulkner, had exactly, exactly, exactly the same qualifications. What pay does she have to get according to the Equal Pay Act? According to the Equal Pay Act, based on that assumption, she has to get the same pay. So in order to make that determination, they're saying we kind of fumbled around. No, I'm saying the Equal Pay Act says you have an affirmative duty when you have this situation to make sure you get it right. And you have to make a comparison. And if all you're saying is you changed, okay, well, show me you did that. Mr. McCorkadale stole some money. Mr. McCorkadale's pay should have been X. No one knows what that is. They had some general idea of it, but nobody knows what it is. Okay, now compare him to her. Is she worth $3,000 less? Is she worth $20,000 less? We'll give her a $17,000 raise because that's fair. Pursuant to the differential. Pursuant to is two words in the statute that can't be thrown out of the statute, which in the jury instruction were thrown out of the statute. And to be fair to the judge, a lot of the jury instructions follow what she used. They're wrong. They mistake the law. They confuse the jury to think that the differential just has to have a cause, a reason. A Chinese law. We had a Chinese law. It was perfect. That's a reason. But does that show that the disparity in pay was pursuant to a particular differential? And they don't show that. I want to make it abundantly clear. Abundantly clear. It's not me. It's in there. It's what these gentlemen said. Mr. Mr. Duracell asked exactly what it was to answer. Who was the guy who apparently was the chief person in charge? What did he tell him about the sound? As I recall, all I all I recall is a number that based on her experience, background in the changing response, responsibility, what her current salary was. That is what he thought would be a fair offer. Differentiation. I don't see it. I'm not saying there has to be a precise numerical equation. There must be like a seniority system. Not a seniority system. I have a seniority system that has been objectively and systematically applied. Mr. Duracell. He didn't consciously. Page 2470. He didn't. He didn't consciously evaluate. The fact of the difference. One thing from the other. I asked him, did he differentiate one thing from the other? I suggested you didn't differentiate one thing from the other. He said his answer was certain. Mr. And what Mr. Corkadel's numbers. Page 2700. Mr. Corkadel's numbers considered his actual pay considered at all in determining Joe Jody. I don't think it was considered. It was consulted. I made a call, but the committee itself has established the 90s. $95,000. I am asking what you did. Did you ask the board? Consider Bob's. What Bob's salary should have been in setting Jody Jody's salary. No, sir. Again, Mr. And now you sit and we had a discussion about how qualifications of Mr. Corkadel's was. You didn't know what his salary was. Did you? I did not. It's hard to compare some. It's very hard to compare something to differentiate something when you don't know what the heck it is. Again, the profit reason and I submitted a letter yesterday to reiterate at least before circuits rulings that the profit reason has to be you have to the way on it is bona fide. There must be a boni bona fide use of the affirmative defense. The 4th, the 10th, the 9th, of course, that was overturned because of the death of one of the justices. They all suggest that not that the affirmative defense must not prove that it could be, but that it was the cause for the differential. And I have points that I just wanted to polish over that I some that I just enjoyed and some are very important. The council said two different things in this case. One, they say the differences, i.e. his qualifications, which you heard this morning. Now, again, take what you heard this morning in the easiest thing, the easiest thing, the proper thing, what you would expect in a case like this was Mr. Bob McCorkadel had all these wonderful credentials. We looked at her credentials and we determined that we needed to differentiate these two and she would be paying less. Again, they didn't do that. All they did was gave her a raise. There's no testimony that they differentiate that they intentionally objectively systematically. I'll leave a little hole in that because I don't know how you systematically deal with the catch all phrase. But in two sides of the case, on one side, they say that those differences are their proffered reason for the disparity in pay. But then when we make note of the substantial increase in business that Joni Faulkner did, and I beg that you look at what she did, she did a fabulous job for this entity. She multiplied this entity. But then when we say that, they say, well, what she does really doesn't have an impact. It really has to do with what amount of construction and the area economics. So as to Ms. Faulkner, she didn't do a darn thing. The thing just grew because it grows. But yet the difference is why we compare. Well, that's inconsistent. I want to make sure I said everything I wanted to say about the. I believe I've covered or reemphasized the issues I have with the people pay plan. There are no facts. I've looked at the fact. In fact, in my brief, I want to say on page it's either footnote 24 page 24 of the opening brief. Counsel says, here's what we did. And there's a footnote in that footnote. They cite every single citation they have that supports that differentiation. And none of us supports a differentiation to go to. To go to move on to the question of the jury's determination that there had been activity, improper activities, retaliation by the council. Ladies and gentlemen, again, I cite the court. It's the constellation of facts. When you read the facts, it's hard to get past. Make sure. Mr. Mr. Andrew testified. At page twenty seven oh six. Twenty seven oh seven. Trying to get to. Where is it? You're asking him. When did the complaints against Ms. Faulkner start arriving? When did the complaints start? And that page twenty six. Did the complaints come after that? The complaints. But one way on page twenty seven said, but one way or another, it came after she expressed her concerns for Mr. Trump. That's when they started making complaints. I saw. I argue in the brief. She had a Pollyanna life. It's clear. And I think there's arguments in the record that clearly she had the highest wage increases of anybody under Mr. McCorkadale. She. She did a fabulous job when she got on board. She did a fabulous job again. She went from 2011 to 2017, grew the greatest business by multiples and multiples and multiples. And she's just a go girl. And she got no raises. Zero, zero, zero raises. And then what's the first thing? Or within six months of Mr. Trahan being told that I have a problem. Mr. Trahan, after 16 years of superlative reviews, 16 years of superlative reviews, Mr. Trahan is now saying you are so bad that if you don't change, you can't keep your employment. If that's not the writing on the wall, there is no writing on the wall. This guy was going to do exactly what he was going to do from the first time when he said, go girl. And then when he wrote, you should have been a speech writer because she had written a speech for him. She was this. She was everything. And all of a sudden she makes a complaint. She turns in. She is a bad apple. And so bad. We need to get rid of you. That's what he told her. It's in the record. Then what does he do? He gets rid of her. And they want to say, well, objectively, objectively, I don't. Again, this at the beginning of this argument, I said, this is the jury's situation, not mine. And the jury had the right to sit there and say, wait, she had, they had once renewed this contract without word, without complaint. Jody Farkner's contract was good enough to allow it to renew. Of course, they renewed it without her getting any raises. I'd renew it, too, because she was a cheap female employee. So they renewed it. No complaints. Not one word. They renew it. She must have been good enough to have it renewed. There must not have been problems with the contract. Then years later, as Mr. Angel Park notes, after she makes complaints, they don't renew the contract. She had a one-year, she had a three-year contract. The day before they determined that they were not going to renew it, she had a three-year contract. The day after they told her they were not going to renew it, she didn't have a three-year contract. The jury has a right to objectively say, I think those two numbers are different. One is better than the other. The jury had the right to take that fact and say, we think that fact results from this circumstance. Looking at all of these facts over time, the jury had a right to say that. Quite honestly, and one of the complaints, and maybe my client should make it to me, and that is some of the things the jury may have did, I didn't argue it in my closing arguments. Sometimes the jury is smarter than the attorneys. And the jury realized that this lady had lost her contract. They had facts before them. That's all they need. Did they have facts before them? Yes, they had facts before them. Based upon those facts, could they think that that was from retaliation? Yes, they could. Could they further take those facts and say, we think one year's pay is an appropriate damage for the result of this retaliation? Yes, they could. The facts are in the record. They're there. They're black and white. On the other hand, the facts are not in the record. Not in the record. That they somehow, again, I'm not asking to do, I'm not suggesting any company in the United States has to have a formula. But they have to do something objectively, intelligently. There has to be an application. I had a bunch of pretty words I'd written down that I wanted to use. But they have to do, you know, they have to do something in a lot of intelligence that we have looked at the differences and pursuant to the And we believe it's X. I couldn't fight them if they did that. Whether they said X is 10,000 less or 5,000 less. That's not the realm of this court to say that's wrong. It is the realm of the support saying they didn't make determination at all. And therefore they didn't apply. They didn't approve of their affirmative defense. Unless you have any questions. Thank you, sir. Let me quickly try to wrap up then. First, addressing the verdict in the safety counsel's favor that there was no disparate treatment because of gender. Number one, I don't think there was an objection to any of the jury instructions. I think there was one objection to a jury interrogatory, but there weren't any objections to the jury instructions made at trial. Number two, I think the best argument, we address all of the arguments he just made in our brief, and the court addressed those in her decision to deny the Rule 50B motion. And I can't say it any better than that, so I won't say it, but I will. This was a comment I made to the jury, and I apologize for the football analogy, but one of the points was, Les Miles, he was the LSU coach. And I don't want to get in trouble if I mention the football team. But when he was let go, he made $4.4 million a year. Edwin Ogeron was hired to replace him. His contract was $3.5 million a year. $900,000 less. Nothing wrong with that. You can do that. If Edwin Ogeron had been Edwina Ogeron, it would be perfectly fine to pay her $3.5 million a year. It's based upon experience. It's based upon salary. And that was the purpose of this entire trial, to put on the evidence that showed the undisputed changes, which the jury understood and clearly agreed to. And the Spencer case that was offered this week and the Stanzial case, which we discussed those at page 24 and 25 of our reply brief, both of those cases deal with summary judgment grants. They aren't cases after a full trial. And here, the jury had the full trial. They heard the evidence, and they made that determination. Lastly, on the retaliation issue, again, there was no allegation or argument of any sort of discharge or constructive or actual. There was no allegation that the contract non-renewal was some sort of It just wasn't argued. And the reason it wasn't argued is because as a matter of fact, the plaintiff still had her same job from the day her lawsuit was filed until after the jury came back. And she had an offer for a new contract at a higher rate of pay at a better objectively guaranteed term. And we can't force her to accept that contract. But she was offered that. And that's the antithesis of retaliation. So, again, I would guide you to our brief if there's any question that you have, if there's any understanding of what I can try to answer today. But without that, I'll conclude. Thank you, sir. Thank you.